UNITED STATES of America, Appellee,

v.

David R. KNOLL and Ted W. Gleave,
Defendants–Appellants.

Nos. 1737, 1738, Dockets 92–1580, 92–1586.

United States Court of Appeals,
Second Circuit.

Argued June 17, 1993.

Decided Feb. 14, 1994.

Lawrence Vilardo, Buffalo, New York (Connors & Vilardo, Buffalo, New York, of counsel), for Defendant–Appellant David R. Knoll.

Philip Halpern, State University of New York, Buffalo, New York, for Defendant–Appellant Ted W. Gleave.

Denise E. O'Donnell, Assistant United States Attorney for the Western District of New York, Buffalo, New York (Dennis C. Vacco, United States Attorney for the Western District of New York, Buffalo, New York, of counsel), for Appellee.

Vincent L. Briccetti, filed a brief on behalf of Amicus Curiae New York State Association of Criminal Defense Lawyers, White Plains, New York.

Before: CARDAMONE and MAHONEY, Circuit Judges, and CEDARBAUM, District Judge.*

CARDAMONE, Circuit Judge:

David R. Knoll and Ted W. Gleave appeal from judgments of conviction entered on September 28, 1992 in the United States District Court for the Western District of New York (Skretny, J.). A jury found Gleave guilty on two counts of bankruptcy fraud in violation of 18 U.S.C. §§ 152 and 2, and found Knoll guilty on one count of violating 18 U.S.C. §§ 152 and 2, for assisting Gleave, and one count of violating 18 U.S.C. §§ 1001 and 2, for aiding Gleave in allegedly making false statements to the probation service. The jury acquitted Gleave and Knoll on 42 other charges that were brought against them in a lengthy indictment, and Gleave was acquitted on one other charge brought solely against him. On September 25, 1992 appellants were each sentenced to two concurrent 27–month terms of imprisonment. All but three months of each appellant's sentence was suspended and the remainder was to be served on probation. In addition, Gleave was fined $5,000 and his term of imprisonment was to be served in a halfway house.

This appeal requires us to examine whether a search and seizure of a client's papers taken from his lawyer's office may violate the Fourth Amendment to the United States Constitution. That amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. The Supreme Court teaches that "[a] 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). One of the principal questions raised is whether appellants' Fourth Amendment rights were violated by an unlawful intrusion.

* Honorable Miriam Goldman Cedarbaum, United States District Court for the Southern District of New York, sitting by designation.

## BACKGROUND

### A. *The Cayman Islands Accounts*

The parties to this appeal cast the relevant factual background in vastly different lights. We set forth only those facts pertinent to the issues presented. Appellants tell us that defendant Knoll, an attorney, went to the British-owned Cayman Islands, found in the Caribbean, south of Cuba and east of Mexico, in 1981 to establish a relationship with Barclays Bank. Knoll had hoped to open an account for an overseas company, Atlantis International, Ltd., and to use it to become involved in international trade. But due to prior financial problems he could not obtain a reference letter that Barclays required from a United States bank. Knoll thus sought out Ted Gleave, a friend and former client, to have him establish accounts with Barclays.

The government portrays the Cayman Islands banking connection differently. It says Gleave was the person who initiated overseas banking relationships. It suggests he did so to hide profits allegedly reaped from the sale of gasoline stolen from Ashland Oil, which sought treble damages in a civil RICO suit against him, and that Knoll was the lawyer that represented Gleave in the suit.

There is no disagreement that in February 1982 Gleave and Knoll went together to the Cayman Islands and there opened two bank accounts: a personal account in Gleave's name with an opening balance of $9,000 and a corporate account in the name of the soon-to-be-formed Atlantis International. They allegedly instructed Barclays that Gleave's personal account was to be closed as soon as Atlantis was formed. Atlantis International was incorporated on March 4, 1982, but for some reason Gleave's private account was never closed. Gleave asserts that though he was the president of the corporation, it was a nominal title and he resigned the position before his August 1982 filing for individual bankruptcy. The government points out, to the contrary, that in a September 1984 power of attorney issued in connection with the Atlantis International account Gleave was listed as the "principal" of Atlantis.

Knoll deposited roughly $600,000 in the Atlantis account with Barclays, ostensibly without Gleave's knowledge. Appellants claim the money did not belong to Gleave and was not fraudulently procured. According to them this large sum was given to Knoll by one Anthony Korobellis. Although Gleave was the official signatory on the corporate Atlantis International checking account, the money in the account was allegedly managed solely by Knoll, who also managed all transactions in the personal account that remained in Gleave's name. Thus, appellants insist Knoll fully controlled Atlantis International and its Cayman Islands accounts.

### B. *Gleave's Bankruptcy Petition*

Meanwhile, Gleave was a party to a divorce proceeding in Indiana. Knoll, acting as Gleave's attorney, recommended that Gleave file Chapter 11 bankruptcy to protect himself from the possibility that his wife would be awarded his assets thereby foreclosing his ability to satisfy his many creditors. Taking this advice, Gleave filed for bankruptcy on August 2, 1982. Knoll prepared and Gleave signed a "Statement of Financial Affairs" that was filed in the bankruptcy court. Question 1.d. of the Statement asked where and under what names Gleave had conducted business during the last six years. In his response Gleave did not list his relationship with Atlantis International. Question 7.a. then asked what bank accounts he had maintained alone or with others in the last two years; Gleave did not mention either his $9,000 personal account or the Atlantis corporate account at Barclays Bank.

Count three of the indictment subsequently charged Gleave with concealing property in a bankruptcy proceeding in violation of 18 U.S.C. § 152. In finding Gleave guilty on that count, the jury found his Cayman Islands personal account should have been disclosed on the bankruptcy petition. Count four of the indictment charged Gleave with making a false declaration in a bankruptcy proceeding in violation of 18 U.S.C. §§ 152 and 2; it also charged Knoll with aiding and abetting Gleave to that end, in violation of 18 U.S.C. §§ 152 and 2. The jury found under count four that Gleave should have disclosed that he was "carrying on business" in the

name of Atlantis International and that Knoll assisted him in the nondisclosure.

### C. *Gleave's Financial Statement*

As an additional matter related to the current convictions, in June 1987 the U.S. Department of Justice sought to collect an outstanding $6,000 criminal fine imposed on Gleave in the Ashland Oil case. In response to a financial statement questionnaire dated June 2, 1987, Gleave answered "No" to questions asking whether in the last two years he had a savings account or a checking account. The jury convicted Knoll on count eight for aiding and abetting Gleave's false answer to the question regarding a savings account.

Appellants maintain the jury's verdict raises a question of consistency because Gleave himself was acquitted on count eight. They also stress that the Barclays account was a checking account, not relevant to the question concerning a possible savings account. The government explains this by pointing to Knoll's intrusive role in Gleave's affairs and the extent of Gleave's reliance on Knoll to complete the financial statement. The government notes that the signature card on the personal account at Barclays listed the account as a "Personal Current Savings/Deposit Account" and contends that the jury properly considered its status.

### D. *The Burglary of Knoll's Law Office*

We come now to the heart of this case: the burglary of attorney Knoll's law office. The government concedes that they first began investigating Knoll and Gleave after obtaining documents stolen from Knoll's law office on the last weekend of June 1986. The burglary of Knoll's law office, planned by one Timothy Ernle while incarcerated in a federal prison on bank robbery charges, was instigated for the purpose of locating incriminating evidence to be used against Knoll, which Ernle could exchange for favorable treatment on the robbery charges he faced. Ernle solicited Albert Hintenberger to break into Knoll's office and steal material. After the break-in was accomplished, Ernle contacted Assistant United States Attorney (AUSA) Anthony Bruce and a delivery of documents and tapes stolen from Knoll's law office was made to AUSA Bruce by Patricia Devany, Ernle's girlfriend.

Conflicting evidence was presented as to whether Ernle had contacted FBI agents prior to the burglary. The evidence showing earlier contact was discredited by the trial court, which found the government had no prior knowledge of the burglary. AUSA Bruce conceded however that after each of the first two deliveries of documents and tapes by Devany, he told Ernle he was disappointed with the material. As a result, Devany under instructions given her by Ernle brought more material to Bruce. AUSA Bruce and FBI agents eventually discovered two letters in Gleave's files, which had been maintained in Knoll's law office, addressed to Barclays Bank in the Cayman Islands. It was through these letters that Barclays' records were obtained by the Department of Justice. The instant prosecution ultimately ensued.

### E. *The Case*

On February 22, 1990 Gleave and Knoll were indicted on 46 counts of conspiracy, bankruptcy fraud, money laundering, interstate transportation of monies obtained by fraud, and making false statements to a department of the United States. The defendants moved to have the documents that were stolen from Knoll's law office suppressed, primarily on the grounds that they were seized in violation of their Fourth Amendment rights. They also moved to dismiss several counts of the indictment, including count four, on the grounds that the counts were barred by the statute of limitations. Judge Skretny denied defendants' motions in a decision reported at *United States v. Gleave*, 786 F.Supp. 258 (W.D.N.Y. 1992). After three months of trial, which had commenced on December 3, 1991, Gleave was convicted on counts three and four, and Knoll was convicted on counts four and eight. This appeal followed.

### DISCUSSION

#### I  Statute of Limitations

◼ We discuss first appellants' common count four convictions for making a false

declaration in a bankruptcy proceeding. Their convictions on this count must be vacated because the statute of limitations expired with respect to the charges contained in count four before the indictment was brought against them. As an initial matter, the government's assertion that appellants waived this claim by failing to raise it is unpersuasive. Knoll's pretrial motion to dismiss clearly stated, "Counts 4 and 5 charging that alleged false statements made in 1982 and filed with the U.S. Bankruptcy Court in Buffalo are totally barred by the 5 year statute of limitations under 18 U.S.C. [§] 3282." An affidavit accompanying the motion spelled out this claim further, and Gleave joined in Knoll's motions. This claim was properly before the district court.

The statute of limitations argument hinges on the fact that the false statements alleged in count four were made in the financial statement signed by Gleave on July 28, 1982. The indictment was not returned against Gleave and Knoll until February 22, 1990, seven and one-half years after the offense. The statute of limitations for federal crimes is generally set at five years unless otherwise explicitly provided. *See* 18 U.S.C. § 3282 (1988). Section 3282 states: "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense ... unless the indictment is found or the information is instituted within five years ... after such offense shall have been committed."

The trial court ruled the statute of limitations bar with respect to count four was overcome by 18 U.S.C. § 3284 (1988). *See Gleave*, 786 F.Supp. at 266. Section 3284 extends the beginning of the limitations period for crimes involving the concealment of a debtor's assets. It provides: "The concealment of assets of a debtor ... shall be deemed to be a continuing offense until the debtor shall have been finally discharged or a discharge denied, and the period of limitations shall not begin to run until such final discharge or denial of discharge." 18 U.S.C. § 3284. Reading that statute literally compels the conclusion that only the concealment of assets—not the making of a false statement in a bankruptcy proceeding—is subject to the extended limitations period of 18 U.S.C. § 3284.

Count four charged that Gleave, aided and abetted by Knoll, "did knowingly and fraudulently and for the purpose of concealing assets of a debtor, make a false declaration under penalty of perjury, in a proceeding under the bankruptcy laws of the United States" in violation of 18 U.S.C. §§ 152 and 2. The count tracks the language of the third paragraph of 18 U.S.C. § 152, which criminalizes knowing and fraudulent false statements made during the course of a bankruptcy proceeding. A separate and distinct statutory provision, the first paragraph of 18 U.S.C. § 152, criminalizes concealment of assets. Despite the fact that the purpose of making the false statement in Gleave's case may well have been to conceal assets, the substance of count four charged only the making of a false statement in connection with bankruptcy proceedings. It did not charge either appellant with the offense of concealment of assets. Hence, the extension of the limitations period provided for in § 3284 has no application to count four. In ruling to the contrary the district court erred.

■ This conclusion accords with the Supreme Court's instructions that criminal statutes of limitations are liberally construed in favor of repose, and that no offense should be construed as continuing a limitations period "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970); *see also United States v. Watson*, 599 F.2d 1149, 1154 (2d Cir.) (exceptions to general statute of limitations are construed strictly), *on reh'g op. revised*, 690 F.2d 15 (2d Cir.1979), *modified sub nom. United States v. Muse*, 633 F.2d 1041 (2d Cir.1980) (en banc), *cert. denied*, 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981).

The general five-year limitations period provided in 18 U.S.C. § 3282 applied to the false statements charged in count four. Since the document containing those state-

ments was signed in 1982, the five-year limitations period was well past when Knoll and Gleave were indicted in 1990. Hence, appellants' convictions on count four must be reversed.

## II Search of Client Files, Documents and Tapes Stolen from Knoll's Law Office

We next address Knoll's count eight conviction. That count charged him with aiding and abetting Gleave's false answer to the question of whether Gleave had a savings account in Gleave's 1987 Department of Justice financial statement. The information regarding the account was obtained from the files stolen from Knoll's law office. The search of those files presents a close and highly fact-bound question of Fourth Amendment law. Appellants assert the trial court erred in three respects: first, in finding the government did not participate in the burglary; second, in failing to consider appellants' argument that it was at the prosecutor's request that private parties searched through the stolen files after they had been removed from the firm; and third, in finding that once the documents were turned over to the government, no unreasonable search occurred when agents read the documents. There is no basis in the record before us to conclude that the trial court's findings on either the first or third point raised were clearly erroneous.

■ Conflicting evidence was presented to the district court on the first point, as to when the government had contact with Ernle. We decline to rehash the district court's findings as to credibility or to second-guess its conclusion that an after-the-fact FBI memo—which dates a discussion between Ernle and an FBI agent concerning Knoll as having occurred before the burglary—contained an error that was satisfactorily explained. *See Gleave*, 786 F.Supp. at 288. With respect to the third point, the district court properly found the documents turned over to AUSA Bruce had already been searched by private parties and that a search warrant therefore was not required to read them. *See id.* at 291. There was thus no Fourth Amendment violation requiring suppression of the documents and papers taken from Knoll's office on that basis.

■ It is the second point, which concerns the period between the burglary and the time the stolen documents and tapes were searched by the private parties, that raises a number of troublesome questions and gives us pause. The potential error on this issue derives from what was not addressed, rather than from what was considered. The trial judge believed the Fourth Amendment had not been violated because he found the search "purely private," and applied the rule that evidence procured through a search by private individuals who are not acting as instruments or agents of the government may be used by the government. *See id.* at 285–86 (citing *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921) and *Coolidge v. New Hampshire*, 403 U.S. 443, 487–88, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971)). Because the government was not involved in the burglary, we agree that this initial search was a private one under *Burdeau* and its progeny.

The district court nonetheless relied too heavily on cases where the government knew of or acquiesced in advance to a private search, *see, e.g., United States v. Bennett*, 709 F.2d 803, 805 (2d Cir.1983); *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987), and in doing so it failed to draw a distinction between the burglary and the search, which were, of course, two separate events. The scope of the search here included Devany's, and perhaps others', specific rummaging through boxes of files that had earlier been stolen from Knoll's law office.

The district court applied the wrong legal standard when it focused its attention only on whether the burglars acted as "agents of the government" during the initial search that took place in Knoll's law office. *Gleave*, 786 F.Supp. at 286. During the continuing discussions between Ernle and AUSA Bruce, the prosecutor said he was disappointed at the material turned over to him and expressly told Ernle that he needed more detailed information. While the government emphasizes that the burglary had already been committed, the AUSA's requests tacitly suggested and condoned further searching, if

necessary, through the stolen documents. The AUSA himself testified that he told Ernle he would have to "get me more information," and, "you've got to turn more over. If there's stuff out there, you've got to turn it over." Bruce made these statements while aware that there had been a burglary; he testified that Ernle made it "abundantly clear that there were a lot of documents that were available to him."

The district court observed that Devany, "after being instructed which of the materials to deliver to the government, ... examined the materials and listened to the tape recordings." *Gleave,* 786 F.Supp. at 291. While it appears all the files had already been taken from Knoll's office, it is not clear from the record that they had necessarily been *opened.* AUSA Bruce did not instruct Ernle to cease conducting any further searches, nor did he ask Ernle any questions with respect to the state of the files and whether they had been opened and examined.

▮▮▮ Because the trial court did not address AUSA Bruce's comments, its discussion missed the crux of this issue. Although the applicable legal standard looks to whether the person searching and seizing was an agent of the government, *see, e.g., United States v. Walther,* 652 F.2d 788, 791 (9th Cir.1981), the standard does not take a solely *ex ante* perspective. The Supreme Court acknowledged in *Lustig v. United States* that "a search is a search by a federal official if he had a hand in it" and that "[s]o long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it." 338 U.S. 74, 78–79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1949) (plurality opinion). *Lustig* makes clear that it is "immaterial" whether the government originated the idea for a search or joined it while it was in progress. *Id.* at 79, 69 S.Ct. at 1374. The government may become a party to a search through nothing more than tacit approval. *See* 1 Wayne R. LaFave, *Search & Seizure* § 1.8(b), at 180 (2d ed. 1987).

As can be seen, the critical issue is the point in time when the object of the search has been completed. If the object has been realized, the government cannot later become

a party to it. By the same token, it may not expand the scope of an ongoing private search unless it has an independent right to do so. *See Walter v. United States,* 447 U.S. 649, 657, 100 S.Ct. 2395, 2402, 65 L.Ed.2d 410 (1980) (plurality opinion). A private party acting as a government agent also may not expand upon a previously private search without running afoul of the Fourth Amendment. Although here the burglary may have been accomplished, that is, the boxes of documents had been stolen from Knoll's office before the government knew of the burglary, the search itself may not have been complete until Devany, upon Ernle's and ultimately AUSA Bruce's request, went through all the stolen files and listened to the tapes to find the material to be turned over to the FBI to be used against Knoll and Gleave. At some point in the ongoing search, Ernle and Devany may have been acting as agents of the government given that AUSA Bruce directed their actions and tacitly approved of whatever measures they took to produce information he wanted from the contents of the files.

Unfortunately, the record respecting the government's role in this affair is incomplete. Hence, we must remand for further factfinding since the testimony elicited at the suppression hearing sheds little light on the issue of the stage of the search at which Devany was effectively directed by government agents to continue looking for more information. In addition, further fact-finding to ascertain the state of the files during the development of the investigation against appellants is needed to determine if Knoll's expectation of privacy in the files continued after the burglary.

▮▮▮ The Fourth Amendment only protects against a search that intrudes upon an individual's reasonable expectation of privacy. *See Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983). If the files were closed and their contents not apparent from the exterior, the reasonable expectation of privacy continued so long as the files had not been searched before contact with the government occurred. Otherwise, that expectation of privacy would have been frustrated and at an end. *See Jacobsen,* 466 U.S. at 117, 104 S.Ct. at 1658;

*see also United States v. Bonfiglio,* 713 F.2d 932, 937 (2d Cir.1983) (clearly labeled cassette tape "had the practical effect of putting the contents of the tape in plain view and therefore reducing the expectation of privacy").

■ Under Fourth Amendment law a container need not be locked or fastened shut for there to be a legitimate expectation of privacy in its contents, though those facts are emphasized when they exist. *See, e.g., Smith v. Ohio,* 494 U.S. 541, 541–42, 110 S.Ct. 1288, 1289, 108 L.Ed.2d 464 (1990) (brown paper bag is a closed container); *United States v. Donnes,* 947 F.2d 1430, 1435–36 (10th Cir. 1991) (reasonable expectation of privacy in opaque camera lens case). The Supreme Court has rejected a constitutional distinction between "worthy" and "unworthy" containers and has noted that "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *United States v. Ross,* 456 U.S. 798, 822–23, 102 S.Ct. 2157, 2171–72, 72 L.Ed.2d 572 (1982). The often-stated requirement that a container need only be "closed" reflects the standard that for there to be a reasonable expectation of privacy, the contents of a container should not be apparent without opening. So long as the opaque file folders were closed or were in closed boxes, and did not reveal their contents, then a reasonable expectation of privacy continued even after they were stolen from Knoll's office.

Ultimately, we think the record has not adequately explored these issues, which we have highlighted to give the district court guidance on remand. We also note the heavy burden borne by the government in justifying a warrantless search. *See United States v. Licata,* 761 F.2d 537, 543 (9th Cir. 1985); 4 Wayne R. LaFave, *Search & Seizure* § 11.2(b), at 218 (2d ed. 1987). If the search is found to be invalid, virtually all the key evidence introduced at trial against Knoll might, in retrospect, require suppression as "fruits of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). Accordingly, the case must be remanded for further

fact-finding before Knoll's count eight conviction may be ruled upon.

III Gleave's Standing to Assert a Fourth Amendment Violation with Respect to Documents and Tapes Stolen from Knoll

■ Whether Gleave's count three conviction may be reviewed depends on whether he has standing to object to the search of Knoll's office. A third party has standing to challenge the constitutionality of a search only when such individual has a "legitimate expectation of privacy" in the premises or items searched. *See Rakas v. Illinois,* 439 U.S. 128, 143, 148–49, 99 S.Ct. 421, 430, 433, 58 L.Ed.2d 387 (1978). The key documents here are two letters addressed to R.C. Sullivan, an officer of Barclays Bank, requesting wire transfers of monies held in the account of Atlantis International. One letter was unsigned and refers only to Knoll; the other was signed by both Knoll and Gleave as "principals" of Atlantis International. These two letters were discovered by the searchers among Knoll's files and turned over to AUSA Bruce who, through the Department of Justice, obtained Atlantis International's banking records in the Cayman Islands and the other evidence introduced at trial.

■ In general, we believe the protection of the Fourth Amendment extends to those papers that a person leaves with his or her lawyer. *Cf. United States v. Lefkowitz,* 285 U.S. 452, 464, 52 S.Ct. 420, 423, 76 L.Ed. 877 (1932) (protection of the Fourth Amendment extends to business offices). This is because the client has a subjective expectation that such papers will be kept private and such expectation is one society recognizes as reasonable. *See Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). But when one party relinquishes control of a letter by sending it to a third party, the reasonableness of the privacy expectation is undermined. *See Ray v. United States Dep't of Justice,* 658 F.2d 608, 611 (8th Cir.1981) (per curiam); *cf. Jacobsen,* 466 U.S. at 114, 104 S.Ct. at 1656 (party maintains expectation of privacy when letter is sealed and in transit).

1322

Here, as an initial matter, the letters are not protected by the attorney-client privilege because their contents relate purely to business transactions. *See United States v. Rosenstein,* 474 F.2d 705, 714 (2d Cir.1973). More importantly, because Gleave sent the letters to an individual with whom he had no relationship of confidentiality, any legitimate expectation of privacy he may have had in them was abandoned. *See United States v. Miller,* 425 U.S. 435, 442, 96 S.Ct. 1619, 1623, 48 L.Ed.2d 71 (1976) (" '[w]hat a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection.' ") (quoting *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)). Without an expectation of privacy, Gleave lacks standing to assert a Fourth Amendment violation. *See Rakas,* 439 U.S. at 148–49, 99 S.Ct. at 433. Absent a showing of such a violation, there is no poisonous tree and thus no fruit requiring suppression. *See Wong Sun,* 371 U.S. at 485, 83 S.Ct. at 416. Accordingly, Gleave's count three conviction may not successfully be challenged on Fourth Amendment grounds.

## IV Other Claims Regarding the Count Three and Eight Convictions

Gleave and Knoll raise a number of other claims of error concerning their respective count three and eight convictions. Although none of them has merit, we write to dispose of them now in the interests of judicial economy.

### A. *Sufficiency of the Evidence*

Viewing the evidence in the light most favorable to the prosecution, *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), adequate proof was introduced at trial to support the count eight and count three convictions. Such evidence undoubtedly supported Gleave's count three conviction. It charged him with concealing property in a bankruptcy proceeding in violation of 18 U.S.C. § 152. The trial proof showed he opened and continued to use the account at Barclays in his own name. Circumstantial evidence demonstrated some or all of the money in the account belonged to him. Ample proof existed therefore to

overcome appellants' arguments that there was an insufficient connection between Gleave and the funds in the account in Gleave's name to charge him with ownership. The jury accordingly was justified in finding that he had concealed assets from the bankruptcy court in not listing this account on his bankruptcy schedules.

Count eight concerned the financial statement Knoll prepared and Gleave submitted to the Department of Justice. The jury convicted Knoll on count eight for aiding and abetting Gleave's false answer to a question on a Department of Justice financial statement asking whether he had a savings account in the last two years. The name of the account—listed on a Barclays card as a "Personal Current Savings/Deposit Account"—furnished sufficient proof for the jury to find the Cayman account was an unrevealed savings account. The jury had to decide whether the financial statement failed to disclose either a checking or a savings account and it decided that the account was best categorized as a savings account. No good reason is advanced for overturning that jury finding.

Whether Knoll's conviction for aiding and abetting may stand when Gleave was acquitted on count eight is a somewhat closer question. Knoll argues that his conviction may not stand in light of *United States v. Ruffin,* 613 F.2d 408, 412 (2d Cir.1979) (defendant charged with aiding and abetting cannot be convicted if crime not committed). Knoll insists the indictment charged him only with aiding and abetting Gleave under 18 U.S.C. § 2(a), not with acting as a principal by causing the offense under 18 U.S.C. § 2(b). We are unable to adopt this proposition. Knoll was here charged not simply as an aider and abettor, but also as a principal. We cannot discern from the record on which role the jury based its conviction, though the government concedes that he could not be found liable were he charged solely as an aider and abettor. But no variance between the indictment and the proof occurred at trial because count eight of the indictment charged Knoll as both principal and aider and abettor, since that count referred only to

18 U.S.C. § 2, without differentiating between its two subsections.

■ We have held that an indictment charging aiding and abetting may be proven by demonstrating that the aider and abettor was in fact a principal. *See United States v. Oates,* 560 F.2d 45, 55 n. 6 (2d Cir.1977). Other circuits have stated that all charges in an indictment implicitly carry an 18 U.S.C. § 2 charge, *see United States v. Galiffa,* 734 F.2d 306, 312 (7th Cir.1984), and courts have encountered no "difficulty sustaining convictions when the indictment did not specify whether the defendant was the aider and abettor or the principal," *United States v. Bryan,* 483 F.2d 88, 95 (3d Cir.1973). Hence, the proof at trial properly showed Knoll acted as a principal, and did not constitute a variance from the indictment.

■ Sufficient evidence surely existed for the jury to find Knoll guilty as a principal for causing Gleave's false financial statement. The proof reflected Gleave's reliance on Knoll and Knoll's role in preparing the financial statement. Since a person may be convicted as a principal for causing an innocent intermediary to violate the law, *see United States v. Tannenbaum,* 934 F.2d 8, 14 (2d Cir.1991), Knoll's count eight conviction as an aider and abettor was sufficiently supported.

### B.   *Prosecutorial Comments*

■ The prosecutor did not improperly comment on Gleave's failure to testify. The test governing whether a prosecutor's statements amount to an improper comment on the accused's silence in violation of the Fifth Amendment looks at the statements in context and examines whether they "naturally and necessarily" would be interpreted by the jury as a comment on the defendant's failure to testify. *See United States v. Bubar,* 567 F.2d 192, 199 (2d Cir.), *cert. denied,* 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). We agree with the government that the first remark—that Ted Gleave was "[t]he only person that knows how that $600,000 got into the Cayman Island bank account"—was a fair response to the defense's claim that the government could not show the origin of the $600,000. The prosecutor's other statement observed that Gleave was "unwilling to admit

he owns" certain property. Since the comment referred to Gleave's unwillingness to admit ownership prior to trial, viewed in context the remark is not a comment on Gleave's failure to testify at trial. In addition, appellants have not shown substantial prejudice as a result of the prosecutor's statements, *see United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981) (per curiam), *cert. denied,* 456 U.S. 989, 73 L.Ed.2d 1284 (1982), a particularly heavy burden inasmuch as the trial court gave a curative instruction as part of its charge.

### C.   *Gleave's Prior Conviction*

■ Gleave's prior conviction in the Ashland case was properly admitted since he acknowledged profiting by over $100,000 from the sale of stolen gasoline in that case. The conviction related to his possible motive for committing the crimes charged in the indictment. *See* Fed.R.Evid. 404(b). Judge Skretny did not abuse his discretion in admitting the evidence. *See United States v. Gilan,* 967 F.2d 776, 780 (2d Cir.1992) (clear abuse of discretion required to overturn 404(b) admissibility decisions).

### D.   *Right to Counsel*

■ Knoll, who represented himself at trial, claims that he was denied his Sixth Amendment right to counsel. We disagree. The trial judge advised Knoll on numerous instances of his right to counsel and the problems he might encounter by proceeding *pro se.* While Knoll at one point stated to the trial court that when he was testifying as a witness he might decide to have "somebody come in from time to time like a cameo role to ask me questions in areas where it doesn't fit with me asking and answering," this did not constitute a request for counsel. Knoll himself stated he was merely "telegraphing" his thoughts to the court. The trial court had no obligation to grant Knoll counsel *sua sponte* in a trial where attorney Knoll did not request it.

### E.   *Speedy Trial*

We also find the Speedy Trial Act was not violated. *See* 18 U.S.C. § 3161 (1988) (re-

quiring the government to bring criminal defendants to trial within 70 days of their first appearance before a judicial office or the filing of an indictment, whichever is later). Excluding relevant time periods pursuant to § 3161(h), many of which were excluded at appellants' requests, both appellants were brought to trial within 70 days.

## CONCLUSION

Accordingly, appellants' count four convictions are reversed. With respect to Knoll's count eight conviction, we remand the case to the district court for it to conduct a hearing consistent with this opinion to resolve issues of fact relevant to the Fourth Amendment suppression issue. Gleave's count three conviction is affirmed. We have carefully considered the remaining arguments appellants raise and find them to be without merit.