UNITED STATES of America,

v.

NUMISGROUP INTERNATIONAL CORP., Numismatic Asset Strategies, Inc., Galerie Des Numisatique, Meridian Numisatics, Inc., Robert Dupurton and Tom Paull, Defendants.

No. CR 00–0352(ADS).

United States District Court,
E.D. New York.

March 23, 2001.

140

Loretta E. Lynch, United States Attorney, Eastern District of New York, Brooklyn by Demetri M. Jones, Michael T. Cornacchia, Kevin P. Mulry, Assistant United States Attorneys, for United States.

Grover & Bloch, New York City by Douglas E. Grover, of counsel, for Defendants Robert Dupurton and Corporate defendants.

Miller & Skubik, Islandia by Richard A. Miller, of counsel, for Defendant Tom Paull.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This suppression hearing was initiated because of the information provided in a letter from Douglas E. Grover, Esq., dated March 9, 2001. In this letter Attorney Grover asserted that there was a theft of documents from the Numisgroup offices by an undercover informant, which theft constituted an illegal search. Further, Attorney Grover contends that this illegal seizure by an agent of the Government vitiates the search warrant previously issued, under which multitudes of records were seized by the Government. The defendants move for the suppression of these documents.

The affidavit in support of the application for arrest and search warrants, by United States Postal Inspector Sol Farash, dated February 25, 2000 describes a conspiracy to defraud with regard to the sale of valuable coins. In this affidavit, Inspector Farash describes a "boiler room" sales operation consisting of a scheme to "fraudulently sell items (coins) at highly inflated prices by means of false and fraudulent representations." Inspector Farash conducted an investigation into the activities of the coin sale businesses involved in this case. He interviewed approximately twenty persons who purchased coins from Numisgroup, Galerie des Numisatique and/or Meridian. Farash also interviewed "a confidential informant," we now know to be one Michael Zelen, "who at the direction and under the supervision of law enforcement agents, obtained a position as a sales person with Numisgroup."

A review of the affidavit in regard to the allegations leading to this suppression hearing reveals that Inspector Farash interviewed George Barre, Roxie Hollingshead and John Pirile, names of customers given to him by the confidential informant. These customers gave relevant information to Farash.

The thrust of the defendants' contention is that, the confidential informant, identified as Michael Zelen, acting as a government agent, illegally seized documents or otherwise illegally obtained information, which was used by Inspector Farash in his

affidavit which supported the Government's successful application for a search warrant. Under these circumstances, according to the defendants, the "fruit of the poisonous tree—the records seized in the Numisgroup office"—must be suppressed.

A suppression hearing was held in response to the defendants' position on March 13 and 14, 2001.

## I. *THE LEGAL STANDARDS*

Presently before the Court are motions by the defendants to suppress any evidence obtained pursuant to the search warrant on the grounds that the information in the affidavit in support of the warrant was illegally obtained by confidential informant Michael Zelen in violation of the defendants' Fourth Amendment rights.

 In order to successfully challenge a search warrant based on the allegations in a supporting affidavit, a defendant "must show by a preponderance of the evidence that the affidavit contained false statements that were material on the issue of probable cause." *U.S. v. Wapnick*, 60 F.3d 948 (2d Cir.1995); see also *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Where the affiant obtains his information from a government informant, a deliberate or reckless falsehood or omission may be grounds for suppression. *Id.* In this case, the Government concedes that Zelen was a confidential informant working undercover for the Government, and thus, any searches or seizures he conducted are the equivalent of Government searches for purposes of the Fourth Amendment.

 The defendants' right to be free from unlawful searches extends only to those items in which they possess a legitimate expectation of privacy. *U.S. v. Knoll*, 16 F.3d 1313, 1320 (2d Cir.1994). In *Knoll*, the Second Circuit discussed the situation in which a government agent makes an unauthorized "search" in a suspect's office. Obviously, if documents are given, made available or openly displayed in plain view to a sales person in the course of his employment, there is no reasonable expectation of privacy and the documents may be used by the Government. It is only when the documents are secured in folders or in locked or even closed private filing cabinets, that the expectation of privacy protects the documents. As stated in *Knoll*:

> The Fourth Amendment only protects against a search that intrudes upon an individual's reasonable expectation of privacy. *See Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983).

\* \* \* \* \* \*

 Under Fourth Amendment law a container need not be locked or fastened shut for there to be a legitimate expectation of privacy in its contents, though those facts are emphasized when they exist. *See, e.g., Smith v. Ohio*, 494 U.S. 541, 541–42, 110 S.Ct. 1288, 1289, 108 L.Ed.2d 464 (1990) (brown paper bag is a closed container); *United States v. Donnes*, 947 F.2d 1430, 1435–36 (10th Cir.1991) (reasonable expectation of privacy in opaque camera lens case). The Supreme Court has rejected a constitutional distinction between "worthy" and "unworthy" containers and has noted that "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view." *United States v. Ross*, 456 U.S. 798, 822–23, 102 S.Ct. 2157, 2171–72, 72 L.Ed.2d 572 (1982). The often-stated requirement that a container need only be "closed" reflects the standard that for there to be a reasonable expectation of privacy, the contents of a container should not be apparent without opening.

So long as the opaque file folders were closed or were in closed boxes, and did not reveal their contents, then a reasonable expectation of privacy continued even after they were stolen from Knoll's office.

The defendants could not support an expectation of privacy in information made available to Zelen in his capacity as salesperson. *See, e.g., U.S. v. Jenkins,* 43 F.3d 447 (5th Cir.1995) (there is no Fourth Amendment violation where informant/employee with routine access to his employer's videotapes searched those tapes and produced them to the Government); *United States v. Goldin,* 1996 WL 294366 at * 16 (S.D.Ala. 1996) (there is no violation where company secretary produced to Government corporate documents that she had access to as part of her employment responsibilities); *see also United States v. Bonfiglio,* 713 F.2d 932, 937 (2d Cir.1983) (clearly labeled cassette tape "had the practical effect of putting the contents of the tape in plain view and therefore reducing the expectation of privacy").

Of course, if the Numisgroup search is found to be invalid, virtually all the documentary evidence seized by the Government from the Numisgroup offices may require suppression as "fruits of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963).

## II. THE HEARING—FINDINGS OF FACT

There were only two witnesses presented at the hearing, Inspector Sol Farash and Michael Zelen, both produced by the Government.

Inspector Sol Farash testified that he was first involved in this matter when he received a call from United States Postal Inspector Mike Hartman from the Harrisburg, Pennsylvania division. Hartman advised him that he had a coin boiler room case and "that he had an individual who was willing to work, who came from the Long Island, New York area." That person, Michael Zelen, had been arrested for and pled guilty to another crime in Pennsylvania. Zelen told Farash about coin boiler rooms on Long Island, including companies called Numisgroup and Nationwide, also known as Meridian, in Holbrook, with one Bob Dupurton as the owner. Zelen told Farash that Dupurton was selling "rare coins" in a classic boiler room operation. Zelen also mentioned other companies called New World Rarities and Heritage Numismatic.

Zelen responded to an employment ad by Numisgroup and set up an interview with John Laura of that company. Farash recalled that he had arrested a John Laura six or seven years ago for a boiler room operation involving chemicals. On September 7, 1999, the day Zelen was to start work at Numisgroup, he met with Farash who directed him to comply with seven conditions (see U.S. Ex. 7). One of the conditions was: "4. You *do not* do anything illegal. *Must Be Clean.*"

Farash testified that he told Zelen on that occasion:

Number four, which I highlighted, and I underlined, you do not, I underlined both, do anything illegal. You must be clean. You must not take anything. You must do nothing wrong. You are working as an agent for the government.

\*　　\*　　\*　　\*　　\*　　\*

Q And number four says, you do not do anything illegal, must be clean; is that right?

A Yes.

Q Were those the exact words that you related to Mr. Zelen?

A And more.

Q And more.

But all you wrote down is you did not—do not do anything illegal, must be clean; is that correct?

A Yes.

Q On direct examination did you say you said something additional in that vein?

A Yes.

Q What was it that you recollect you told Mr. Zelen along that vein?

A In substance, I don't want him stealing anything. I don't want him cheating anybody. I don't want anything illegal. In other words, you have to be squeaky clean because you are an agent of the government.

Q And those are the things that you recollect telling him?

A In substance, yes.

Q Don't steal anything?

A Yes.

Q Don't take anything?

A Yes.

Q Don't do anything illegal?

A Right.

Q You are an agent of the government?

A Right.

Q Did he tell you that he understood that, sir?

A He understood it by signing the document.

Tr. at 16–17, 68–69.*

Zelen signed the written seven-condition memo.

After he commenced his employment with Numisgroup, Zelen sent Farash a series of fax transmissions including some Numisgroup documents. The questionable potentially illegally seized evidence is contained in these fax transmissions and the

documents enclosed. Farash also denied seeing any "folders" that Zelen may have created. All the information he obtained from Zelen was by fax or by telephone. There are two types of potentially illegal evidence "seized" by Zelen. First, the documents he sent to Farash. Second, the names of customers he related to Farash. As will shortly be shown, the proof is clear that none of this evidence was illegally seized.

The Court had to review the documents sent by Zelen to Farash and ascertain how they were obtained. There were approximately 22 documents sent by Zelen to Farash while employed by Numisgroup. Many of them can be easily shown to be records given to Zelen by his employer or co-employees in the course of his employment; clearly with no reasonable expectation of privacy and not illegally seized. Among these documents are Zelen's own paychecks and commission reports; the memo to the staff (U.S.Ex. 1E); and the sketch of the office made by Zelen (U.S.Ex. 1S). The other documents sent by Zelen to Farash will be addressed by the Court in its review of Zelen's testimony.

The final Zelen fax transmission was received by Farash on January 29, 2000. Of importance to this inquiry, Farash testified that he interviewed several witnesses whose names were furnished by Zelen, namely, George Barre, Roxie Hollingshead and John Pirile.

The key witness at this hearing was the confidential informant, Michael Zelen. The Court found Zelen to be a very credible witness. His answers were responsive both on direct and cross examination and he showed an admirable candor in revealing derogatory information.

---

* Tr. refers to the Suppression Hearing transcript.

144

Zelen pled guilty in the United States District Court in the Middle District of Pennsylvania to conspiracy to commit mail and wire fraud. He was sentenced in April 2000 to 27 months, later reduced to 11 months. Zelen testified that, at the suggestion of Inspector Hartman, he called Inspector Farash in the first week of September. He wanted to cooperate in the investigation of boiler rooms on Long Island, for "it might somehow benefit me down the road. . . . He would speak to the U.S. Attorney on my behalf." (Tr. at 153). At the time Zelen was living in Nesconset on Long Island. Zelen signed the seven-condition memorandum presented to him by Farash on September 7, 1999. He received instructions from Farash at that time not to do anything illegally and just gather information.

Zelen answered a Numisgroup ad in the newspaper, was interviewed by John Laura and was hired as a coin salesman to follow leads obtained by Numisgroup advertisements. The sales were conducted by telephone. At first, he worked in the "bullpen" or pit area for a few months. In the bullpen he worked in the same area as 5 or 6 other salespeople. Zelen was then moved to an office which he shared with Rob Garner and Calvin Richards. In these shared offices he received leads from the other salespersons who were unsuccessful in their own selling efforts.

■ Zelen sent a number of fax transmissions to Farash, some of which enclosed documents. In the significant phase of this hearing, Zelen explained how he obtained these documents. The Court will now review this testimony:

*Govt. Exhibit 1A*—wiring instructions. Zelen testified that this document was tacked on a bulletin board or was in the drawer of the unlocked desk assigned to him.

*Govt. Exhibit 1B*—a fax dated April 1, 1999 to Alan Leonard at Numisgroup from customer Gregg Holden, complaining about the prices he paid for the coins sold to him by Alan Leonard. Zelen testified that Alan Leonard was a salesman at Numisgroup when he worked there and explained how he obtained this document:

Q Exhibit 1–B before you, Mr. Zelen, tell the Court what 1–B is.

A It is a letter from a customer, Greg Holden.

Q Who is it directed to?

A To Alan Leonard.

Q Is this one of the documents you faxed to Inspector Farash?

A Yes.

Q How did you come to be in possession of Exhibit 1–B?

A Alan Leonard gave me a bunch of accounts and told me he couldn't sell them, to see what I could do with them.

Q Now, the person you know as Alan Leonard, was that person working at Numisgroup when you started working there?

A Yes.

\* \* \* \* \* \*

Q But you are sure that Alan Leonard gave you—the person you know as Alan Leonard gave you this document?

A Yes.

Q And he gave it to you for the purpose of trying to sell to the customer; is that correct?

A Yes.

Tr. at 166–67.

*Govt. Exhibit 1P*—a handwritten memo by Zelen faxed to Farash on January 10, 2000 advising him of "this client George Barre of Texas." Zelen testified that he learned of Barre from other companies he worked for in the coin selling industry. He stated that it was common practice in

the coin industry to swap customer names and phone numbers.

Q How did you learn about George Barre?

A I first got his name from some other companies that I worked with. And he faxed over a list of his coins, and the salesman who wanted to do a trade with him wanted me to price the coins for him.

Q Who was the salesman that George Barre first faxed his coin list to?

A Nick Masone.

Q Where did Nick Masone receive—work when he received the fax?

A He worked with myself at different companies.

Q Was he an employee at Numisgroup-when he received this fax?

A He might have been.

Q Now, you said there was an inventory—

THE COURT: Before you leave that, I am somewhat uncertain how you learned of the name George Barre. Would you tell us again.

THE WITNESS: A lot of companies were similar customers at different companies. And different salespersons would have sold them different coins when they were with different companies.

THE COURT: And how did you learn about the name George Barre? Tell me again how you learned that.

THE WITNESS: I learned the name George Barre when his list of coins was given to me to be priced.

THE COURT: Who gave you the list of coins?

THE WITNESS: Nick had it faxed to my house.

THE COURT: Nick Masone faxed the list to your house?

THE WITNESS: He spoke to the customer, and the customer faxed it to me.

THE COURT: Barre faxed it to you?

THE WITNESS: Yes.

THE COURT: To your house?

THE WITNESS: Correct.

THE COURT: That's how you first heard of him?

THE WITNESS: Yes.

I heard the name before, but I just never did anything with him.

THE COURT: Where did you hear the name before?

THE WITNESS: Different companies I worked at, he was a player.

THE COURT: Different companies, not Numisgroup?

THE WITNESS: Correct.

THE COURT: Different companies you worked at before Numisgroup?

THE WITNESS: Correct.

THE COURT: He was a player?

THE WITNESS: He was a buyer. He bought from everybody who called him.

THE COURT: You may proceed.

MS. JONES: Thank you.

\* \* \* \* \* \*

Q How did you know George Barre from before?

A I have heard about his name through the industry, that he would buy from anybody who called.

Q Through the industry?

A Different coin dealers.

Tr. 169–71, 211.

*Govt. Exhibit 1X*—"Coin inventory—Barre." Zelen testified that the document was "Mr. Barre's inventory of coins," as it states. He testified that the document was faxed to him at his home by Barre or his wife while he was working for Numis-

group. In September, 1999 Zelen was selling coins on the side through his own company known as Certified Rarities.

*Govt. Exhibit 1W*—A handwritten note from Zelen to Farash dated Sunday, January 10, 2000, containing four names, Phillip Silverberg, Joe Burno, Don Kopecky and Don Robinson with their phone numbers. Asked how he obtained their names and numbers. Zelen responded that these are the names of "big buyers that four or five different companies had and they were given to me by different salespeople."

Q Mr. Zelen, what was the reason that these names were given to you?

A Because they were people that had bought substantial dollars in coins, and the people that gave them to me couldn't sell them any more.

Q So, why were you given the name?

A A fresh voice, to try to sell these people.

Tr. at 176.

*Govt. Exhibit 1Q*—Tuesday, January 18, 2000 advertisements. Zelen explained that this document was the Numisgroup "January 18" specials for newspaper advertisement. The document was "placed on every desk" by the sales manager or the person who designed the ads.

*Govt. Exhibit 1R*—This was a handwritten note from Zelen to Farash dated January 18, 2000 and noted "a couple of customers that bought from Numisgroup," including Roxy Hollingshead, and their phone numbers. Zelen explained that this is a list of customers who bought coins from several different companies. The names were "again, given to me in leads from other salespersons" while he was working at Numisgroup. The names were given to him by other salespersons "to try to sell them," and he did speak to these customers and try to sell them, without success.

*Govt. Exhibit 3500–202*—This was a handwritten note from Zelen to Farash dated January 20, 2000 contained a "list of the customers' names that I got from several different salespersons." Among the names on the list was that of John Pirile. Again, Zelen received these names from other salespersons so that he could try to sell them.

*Govt. Exhibit 1T*—"Conversion Specials" Zelen testified that this was a "coin inventory with specials to sell in newspaper ads." This document was placed on every salesperson's desk by the sales manager or by the person who designed the layout.

*Govt. Exhibit 1U*—The Tuesday, January 28, 2000 newspaper ads, also put on his desk by the sales manager or the person who ran the ad.

*Govt. Exhibit 1O*—"Independent Contractor Agreement" Zelen testified that he signed this agreement on January 3, 2000. At that time he did not read the five page printed agreement. He admitted that he violated the "non-compete" portion of the agreement in that he did sell customers on his own while he was working for Numisgroup. He said he sold "probably a dozen or two dozen" customers outside of his employment with Numisgroup for substantial amounts. He made these sales with the assistance of other Numisgroup salespeople.

Zelen testified that he was not given any promise by the Government, for his appearance at this hearing. However, a letter had been written on his behalf concerning his sentence in Pennsylvania.

Zelen testified that, during the time he worked at Numisgroup, he never went into any locked office to retrieve any documents or information for Inspector Farash; nor did he go into any locked room or locked file or any closed drawers; nor was

he directed to do so by Farash. Also, Farash never asked him to tape record anything, wear a "bug" or photograph or copy anything, and he complied with these requests.

Zelen left the employ of Numisgroup in February or March 2000. During the time he worked for Numisgroup he never personally met with Farash.

## III. CONCLUSIONS

Even though Zelen was acting as a government agent while he was employed as a salesman at Numisgroup, the documents and information he obtained and related or sent to Farash, did not constitute an illegal search. The defendants did not possess a legitimate expectation of privacy as to the documents provided to Zelen. On the contrary, the documents were voluntarily given to him or openly displayed to him in plain view as part of his employment as a salesman. The Court finds that neither Zelen nor Farash violated the Fourth Amendment, as to an illegal search and seizure, in any manner. In addition, the names of the customers were legally obtained by Zelen and related to Farash, so that the statements in the affidavit in support of the search warrant were true and were not based on an illegal search and seizure.

Accordingly, the motion by the defendants to suppress the documents obtained by Zelen and transmitted to Farash, as well as the documents seized as a result of the search warrant, are denied.

**SO ORDERED.**